# Plaintiff Will Graven's Complaint

## Case No.:  CV2019-_____

## Filed June 28, 2019

## Assigned for all practical purposes to the Honorable

_____

*Will Graven,*

Plaintiff,

*v.*

*State of Arizona,*

Defendants,

in

United Sates District Court,
District of Arizona,
Phoenix Division.

# Exhibit 3

# Plaintiff Will Graven's Complaint
## Case No.:  CV2019-_____
### Filed June 28, 2019
Assigned for all practical purposes to the Honorable

_____

*Will Graven,*
Plaintiff,

*v.*

*State of Arizona,*
Defendants,

in

United Sates District Court,
District of Arizona,
Phoenix Division.

# Exhibit 3

**<u>Note</u>:** The pages of this Plea Agreement that are germane to this reference are the underlined sections of the 3rd of set of numbered pages, pages 3 and 4. This Agreement was found on the 9 cd's I was given by the AzAGO (**Ex 17**).

IN THE SUPERIOR COURT OF THE STATE OF ARIZONA
IN AND FOR THE COUNTY OF MARICOPA

THE STATE OF ARIZONA,                                )
                                                     )
                    Plaintiff,                       )
                                                     )
            vs.                                      )
                                                     )
DEBORAH DUBREE,                                      )   CR2014-001649-006
                                                     )
                                                     )
                    Defendant.                       )   PLEA AGREEMENT
                                                     )
_____                     )
                                                     )

The State of Arizona and the Defendant hereby agree to the following disposition of this case:

Plea:   The Defendant agrees to plead GUILTY to:

COUNT 1: AMENDED, COMPOUNDING, A CLASS 6 UNDESIGNATED FELONY, in violation of A.R.S. §§ 13-2405, 13-604, 13-701, 13-702, and 13-801 committed between October 5, 2006 and March 28, 2006.

This is a non-dangerous, non-repetitive offense under the criminal code.

*THIS OFFER EXPIRES AND IS REVOKED IF NOT ENTERED IN COURT BY April 22, 2015*

Terms:  On the following understandings, terms and conditions:

1.  The crime carries a presumptive sentence of 1 years; a minimum sentence of .5 years (.33 years if trial court makes exceptional circumstances finding); and a maximum sentence of 1.5 years (2 years if trial court makes exceptional circumstances finding).  Probation is available.  Restitution of economic loss to the victim and waiver of extradition for probation revocation procedures are required.  The maximum fine that can be imposed is $150,000.00 plus an 80% surcharge plus $20.00 pursuant to A.R.S. § 12-269 plus a $13.00 assessment pursuant to A.R.S. § 12-116.04.  If the Defendant is sentenced to prison, the Defendant shall also be sentenced to serve a term of community supervision equal to one-seventh of the prison term to be served consecutively to the actual period of imprisonment.  If the Defendant fails to abide by the conditions of community supervision, the Defendant can be required to serve the remaining term of community supervision in prison.  Within 30 days of being sentenced,  pursuant to A.R.S. 13-610, the defendant shall provide a sufficient sample of blood or other bodily substance for deoxyribonucleic acid (DNA) testing and extraction to be used for law enforcement identification purposes and/or for use in a criminal prosecution and/or for use in a proceeding under title 36, chapter 37.   Special conditions regarding the sentence imposed by statute (if any) are:  If this offense is designated a misdemeanor, the defendant can receive a maximum of 6 months in jail and a maximum fine of $2,500 plus an 84% surcharge.

2.  The parties stipulate to the following additional terms, subject to court approval at the time of sentencing as set forth in paragraph 7: As to Count 1, the defendant will be sentenced to probation.  The amount of restitution to the victim Will Graven will be equal to the net dollar amount obtained by the liquidation of defendant's assets forfeited through the stipulated judgement and order related to CV2014-009284.  The defendant agrees to the attached Factual Basis Addendum and the attached Testimonial Agreement.  This offense may be designated a misdemeanor only upon successful completion of probation.  There are no additional agreements.

3.  The following charges are dismissed, or if not yet filed, shall not be brought against the Defendant by the Arizona Attorney General's Office: Counts 2 and 3.  The Arizona Attorney General's Office agrees to not file charges against the defendant arising out of Arizona Attorney General Report #2011-2341, but does not bind any other agency.

State of Arizona v. Deborah Dubree
Cause Number: CR2014-001649-006
PLEA AGREEMENT

4. This agreement serves to amend the complaint, indictment, or information, to charge the offense to which the Defendant pleads, without the filing of any additional pleading. However, if the plea is rejected by the court or withdrawn by either party, or if the conviction is subsequently reversed, the original charges and any charges that are dismissed by reason of this plea agreement are automatically reinstated.

5. If the Defendant is charged with a felony, he hereby waives and gives up his rights to a preliminary hearing or other probable cause determination on the charges to which he pleads. The Defendant agrees that this agreement shall not be binding on the State should the Defendant be charged with or commit a crime between the time of this agreement and the time for sentencing in this cause; nor shall this agreement be binding on the State until the State confirms all representations made by the Defendant and his attorney, to-wit: **The defendant avows to having no prior felony convictions and that she was not on probation, parole, community supervision or release at the time of the offense.** If the Defendant fails to appear for sentencing, the court may disregard the stipulated sentence and impose any lawful sentence which is the same as or exceeds the stipulated sentence in the plea agreement. In the event the court rejects the plea, or either the State or the Defendant withdraws the plea, the Defendant hereby waives and gives up his right to a preliminary hearing or other probable cause determination on the original charges.

6. Unless this plea is rejected by the court or withdrawn by either party, the Defendant hereby waives and gives up any and all motions, defenses, objections, or requests which he has made or raised, or could assert hereafter, to the court's entry of judgment against him and imposition of a sentence upon him consistent with this agreement. By entering this agreement, the Defendant further waives and gives up the right to appeal.

7. The parties hereto fully and completely understand and agree that by entering into a plea agreement, the defendant consents to judicial fact finding by preponderance of the evidence as to any aspect or enhancement of sentence and that any sentence either stipulated to or recommended herein in paragraph two is not binding on the court. In making the sentencing determination, the court is not bound by the rules of evidence. If after accepting this plea the court concludes that any of the plea agreement's provisions regarding the sentence or the term and conditions of probation are inappropriate, it can reject the plea. If the court decides to reject the plea agreement provisions regarding sentencing, it must give both the state and the Defendant an opportunity to withdraw from the plea agreement. In case this plea agreement is withdrawn, all original charges will automatically be reinstated. The Defendant in such case waives and gives up his right to a probable cause determination on the original charges.

8. If the court decides to reject the plea agreement provisions regarding sentencing and neither the State nor the Defendant elects to withdraw the plea agreement, then any sentence either stipulated to or recommended herein in paragraph 2 is not binding upon the court, and the court is bound only by the sentencing limits set forth in paragraph 1 and the applicable statutes.

9. This plea agreement does not in any way compromise, or provide any protection or defense with regard to, any civil action, whether by or on behalf of a victim or any government entity, and whether previously or later filed, including but not limited to an action pursuant to A.R.S. Title 13, Chapter 23 or § 13-4301-4315; nor does it abrogate or limit the provisions of A.R.S. § 13-2314(H) or A.R.S. § 13-4310(C), or in any other way adversely affect the State in any current or future forfeiture proceeding or other civil action pursuant to A.R.S. § 13-2314, § 13-4301-4315, or § 32-1993, if applicable.

10. I understand that if I am not a citizen of the United States that my decision to go to trial or enter into a plea agreement may have immigration consequences. Specifically, I understand that pleading guilty or no contest to a crime may affect my immigration status. Admitting guilt may result in deportation even if the charge is later dismissed. My plea or admission of guilt could result in my deportation or removal, could prevent me from ever being able to get legal status in the United States, or could prevent me from becoming a United States citizen. I understand that I am not required to disclose my legal status in the United States to the court.

11. I have read and understand all of the provisions, on all of the pages, of this agreement. I have discussed the case and my constitutional rights with my lawyer. My lawyer has explained the nature of the charge(s) and the elements of the crime(s) to which I am pleading. I understand that by pleading **GUILTY** I will be waiving and

State of Arizona v. Deborah Dubree
Cause Number: CR2014-001649-006
PLEA AGREEMENT

giving up my right to a determination of probable cause, to a trial by jury to determine guilt and to determine any fact used to impose a sentence within the range stated above in paragraph one, to confront, cross-examine, compel the attendance of witnesses, to present evidence in my behalf, my right to remain silent, my privilege against self-incrimination, presumption of innocence and right to appeal. I agree to enter my plea as indicated above on the terms and conditions set forth herein. I fully understand that if, as part of this plea agreement, I am granted probation by the court, the terms and conditions thereof are subject to modification at any time during the period of probation. I understand that if I violate any of the written conditions of my probation, my probation may be terminated and I can be sentenced to any term or terms stated above in paragraph one, without limitation.

I have personally and voluntarily placed my initials in each of the above boxes and signed the signature line below to indicate I read and approved all of the previous paragraphs in this agreement, both individually and as a total binding agreement.

Date: _21 - April - 15_          Defendant _____
                                       Deborah Dubree

I have discussed this case with my client in detail and advised him of his constitutional rights and all possible defenses. I have also explained the nature of the charge(s) and the elements of the crime(s). I believe that the plea and disposition set forth herein are appropriate under the facts of this case. I concur in the entry of the plea as indicated above and on the terms and conditions set forth herein.

Date: _4/21/15_          Defense Counsel _____
                                 Milo Iniquez

I have reviewed this matter and concur that the plea and disposition set forth herein are appropriate and are in the interests of justice.

Date: _4-21-15_          Prosecutor _____
                             Joseph Waters

THE ATTORNEY GENERAL'S OFFICE
TESTIMONIAL AGREEMENT

1.  The defendant will provide complete and truthful testimony and information regarding the information in the factual basis addendum for CR2014-001649 and concerning the participation and specific role of any co-defendants in any criminal cause numbers or any criminal cause number involving Will Graven or a business of Will Graven's as a victim currently indicted or to be indicted.  The defendant must also testify about the structure, organization, plans, schemes, individual roles and involvement of every person that participated in the criminal cases that will be initiated. The defendant will not withhold any information and will provide additional information if the State has follow up questions regarding its investigation.  The defendant will not attempt to protect any person or entity through false information or omission.   The defendant will not falsely implicate any person or entity through false information or omission.  Because the State of Arizona insists on the defendant telling the truth in this matter, in the event that the defendant is called as a witness, the defendant's failure to provide truthful information will constitute a breach of this Testimonial Agreement.  Accordingly, the defendant will at all times tell the truth, regardless of who asks the questions, during all stages of investigation, in discovery, and/or as a witness in any interview, deposition, or in any proceeding in any court (including but not limited to any grand jury proceeding, forfeiture proceeding, hearing on bail, bond, or conditions of release, pretrial hearing, civil or criminal trial, retrial, evidentiary hearing, post-conviction relief proceeding, habeas corpus proceeding, or other post-trial hearing).  The defendant further understands that if the defendant refuses to answer any question by asserting a right against self-incrimination (whether that right is asserted under the Fifth Amendment to the United States Constitution, under the Arizona Constitution, or any other authority), this refusal will constitute an immediate breach of the Testimonial Agreement.

2.  The Attorney General's Office (AGO) may confirm the accuracy of any information the defendant provides under the terms of this Testimonial Agreement by any investigative means the AGO deems appropriate and necessary.  If the defendant is found to have breached this Testimonial Agreement, any statements the defendant has made or any information the defendant has provided pursuant to this Testimonial Agreement may be used against the defendant in any criminal action brought by the State

including the charges subject to this Testimonial Agreement and the related plea agreement in CR 2014-001649. The defendant waives any statute of limitations, speedy trial, and constitutional restrictions that would otherwise limit the AGO's ability to bring charges or new charges as referenced in the charges the State is agreeing to not file in the plea agreement against the defendant if defendant breaches this agreement and the State resumes prosecution of the charges or otherwise files charges against defendant resulting from the breach of the Testimonial Agreement. In particular, nothing in this Testimonial Agreement protects the defendant from prosecution for perjury, false statement, or any other offense the defendant may commit after the date of this Testimonial Agreement. In all such prosecutions, the AGO may use against the defendant any information, statements, documents, and/or evidence that the defendant has provided pursuant to this Testimonial Agreement.

3. If after a hearing there is a determination that the defendant has breached any part of this Testimonial Agreement, the AGO may elect to either withdraw from the plea agreement or leave the plea agreement in place, thus allowing the court to impose any lawful sentence which is the same as or exceeds the stipulated sentence in the plea agreement.

4. The parties agree that the outcome of any cases does not determine whether the defendant has complied with this Testimonial Agreement. Only the defendant's compliance with the requirements listed in Paragraph #1 will determine whether the defendant has complied with this Testimonial Agreement.

5. The defendant understands that in the event she breaches any provision of this Testimonial Agreement, information provided by him during any "free talk" interview(s) or any derivative information obtained from that interview may be used against him in any future proceedings.

6. The defendant agrees to waive all Rule 8 and constitutional speedy trial objections and to not be sentenced until final resolution by plea or trials of all individuals covered by this agreement. The

defendant understands that if she is sentenced prior to her failure or refusal to testify truthfully in any trial, retrial, interview, hearing, or other court ordered proceeding, upon reinstatement of the original charges in the matter for which she has been sentenced, she may only argue for credit for time served. She hereby waives any other claim of due process violation, double jeopardy, speedy trial, or other alleged constitutional violation based on the reinstatement of the original charges.

**DEFENDANT:** I have read and approved all of the previous paragraphs in the agreement, both individually and as a total binding agreement.

Defendant: _____   Date: 21 - April - 15
              Deborah Dubree

**DEFENSE COUNSEL:** I have discussed this case with my client in detail and have advised her of her constitutional rights and all possible defenses. I believe that the terms set forth in this testimonial agreement are appropriate under the facts of this case. I concur in my client's entering this agreement.

Defense Counsel: _____   Date: 4/21/15
              Milo Iniquez
              Defense Attorney

**PROSECUTOR:** I have reviewed this matter and concur that the terms of this agreement are appropriate and in the interests of justice.

Prosecutor: _____   Date: 4-22-15
              Joseph Waters
              Assistant Attorney General

4421181

3

IN THE SUPERIOR COURT OF THE STATE OF ARIZONA
IN AND FOR THE COUNTY OF MARICOPA

| | | |
|---|---|---|
| THE STATE OF ARIZONA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| DEBORAH DUBREE, | ) | CR2014-001649-006 |
| | ) | |
| | ) | |
| Defendant. | ) | PLEA AGREEMENT |
| | ) | |
| | ) | |

<u>FACTUAL BASIS ADDENDUM:</u>

1.    The parties hereto fully and completely agree to the following factual basis for the offenses committed by Defendant:

On 12/1/2004, Will Graven and Deborah Dubree entered into a verbal consulting agreement that gave Will Graven the option to purchase Arizona Building Systems (ABS) for $350,000. Will Graven and Deborah Dubree codified and signed the corresponding written Consulting and Option Agreement on 1/8/2005.

Immediately after Will Graven and Deborah Dubree signed the Consulting and Option Agreement, Will Graven took control of all ABS finances. In particular, Will Graven monitored and approved all payables, which was something Deborah Dubree sincerely appreciated.

By the middle of 2/2005, operating under the Consulting and Option Agreement, Will Graven decided not to exercise his option and to leave ABS. Deborah Dubree asked Will Graven to stay with ABS long enough for her to separate her personal finances and obligations from the company's finances and obligations because she was concerned that an ABS failure could drag her into personal bankruptcy. Deborah Dubree told Will Graven that if he stayed at ABS long enough to help her avoid personal bankruptcy, she would walk away from ABS and Will Graven could have the entire company for a dollar. Will Graven agreed, but in an effort to reduce costs associated with Deborah Dubree's bi-monthly draws, he encouraged her to terminate her employment agreement, and in exchange, Will Graven would let her retain 9.9% ownership in ABS. He drafted and presented to Deborah Dubree an amendment to the Consulting and Option Agreement that enabled her to retain 9.9% ownership in exchange for terminating her ABS employment agreement. Despite Will Graven's efforts, Deborah Dubree turned down the 9.9% ownership and elected instead to remain with ABS as an employee (in the event Will Graven exercised his option).

On 2/18/2005, in a second effort to convince Deborah Dubree to become a 9.9% owner instead of remain an employee, Will Graven drafted a second amendment to the Consulting and Option Agreement. In this second amendment, Will Graven included verbiage to specifically address Deborah Dubree's concerns related to her personal finances – that he would make a best faith effort to eliminate any potential liability against Deborah Dubree as quickly as possible. Deborah Dubree again refused and said she wanted to stay with ABS as an employee (in the event Will Graven exercised his option).

On 2/18/2005, Will Graven drafted a third amendment to reflect Deborah Dubree's decision to remain an employee instead of becoming a 9.9% owner. Specifically, Will Graven agreed to sign Deborah Dubree's ABS Employment Agreement if and when Will Graven exercised his option so that Deborah Dubree would remain an ABS employee. Both Deborah Dubree and Will Graven signed this third amendment on 2/18/2005.

A few days later on 2/21/2005, Deborah Dubree asked Will Graven to draft a fourth amendment to the Consulting and Option Agreement. Deborah Dubree was the sole manager of Spirit Wolf, LLC, which owned the office building that ABS occupied at 3636 East Anne Street, Phoenix. Deborah Dubree said she planned to sell the building, so she asked Will Graven, if he exercised his option, to have ABS vacate the building as soon as possible. Deborah Dubree agreed to help offset the anticipated $15-20K in moving costs by not charging ABS rent for two months. Will Graven agreed. On 2/21/2005, both Will Graven and Deborah Dubree signed this fourth and final amendment. The entire agreement between Will Graven and Deborah Dubree was codified by the initial Consulting and Option Agreement and this fourth amendment.

In mid-2005, Deborah Dubree learned that Will Graven formed California Building Systems (CBS), which was a legal entity entirely separate from ABS. When it was first formed, Deborah Dubree had no ownership in CBS.

In mid-2005, Will Graven told Deborah Dubree he needed an attorney to represent him on several different personal and corporate matters. Deborah Dubree referred Will Graven to several different law firms including Snell & Wilmer. Deborah Dubree and Snell & Wilmer Attorney Jim Sienicki had known of each other for several years as they were both members of Construction Financial Management Association (CFMA). Will Graven met with several different law firms, including Attorney Jim Sienicki, and decided to hire Snell & Wilmer. Deborah Dubree remembers the primary reasons Will Graven hired Snell & Wilmer to represent him was because it was a national, well-recognized, and respected law firm he could trust; and because it had specific expertise in Native American law, which was an area into which Will Graven wanted to expand his development efforts. Deborah Dubree did not need an attorney because she had an existing relationship with the law firm DeConcini McDonald Yetwin & Lacy, P.C.

In about 6/2005, Will Graven told Deborah Dubree he was starting to make significant progress in his efforts to generate development business in Victorville, California.

In about 7/2005, Deborah Dubree learned that Will Graven formed CBS Aviation Development (CBS Aviation), which was a legal entity entirely separate from ABS and CBS. When it was first formed, Deborah Dubree had no ownership in CBS Aviation.

In mid to late 2005, Deborah Dubree learned that Will Graven reached an agreement in Victorville, California, to have CBS Aviation and CBS develop and construct a large commercial airplane hangar worth approximately $12 million. In the wake of Will Graven winning this new business, Deborah Dubree joked with Will Graven that she should have accepted his earlier offer to give her 9.9% of ABS in exchange for terminating her ABS employment agreement.

In about 8/2005, Deborah Dubree learned that Will Graven reached an agreement to build a second hangar in Victorville, California, worth approximately $8 million, and she was aware of a lot of other projects being discussed in Victorville, California, as well. In the wake of this second agreement, and even more projects on the horizon, Deborah Dubree asked Will Graven if he would reconsider the agreement from 2/18/2005, in which Will Graven first proposed giving her 9.9% ownership in exchange for terminating her employment agreement. Will Graven told Deborah Dubree he would think about it.

In about 8-9/2005, as Will Graven continued to generate new business for ABS, and as Will Graven was considering Deborah Dubree's request to retain some ownership, Deborah Dubree started to regret selling the company.

On 9/19/2005, Deborah Dubree and Will Graven hired Daniel Esposito as general counsel for ABS, CBS, and CBS Aviation. Deborah Dubree and Will Graven were concerned that Daniel Esposito was inexperienced in business and corporate legal matters but hired him anyway because of his enthusiasm and eagerness to learn. Will Graven and Deborah Dubree also agreed that Will Graven would ask his attorneys at Snell & Wilmer to keep a "watchful eye" on Daniel Esposito and to advise Will Graven if they observed any issues related to Daniel Esposito's performance. Will Graven and Deborah Dubree made it clear to Daniel Esposito that his employment agreement did not give him the authority to hire employees, give raises or bonuses, sign checks or contracts, or otherwise obligate the company.

In mid to late 9/2005, Deborah Dubree interviewed and offered positions to Thaddeus Sobarnia and Michael Martin as co-senior vice presidents of construction; and Douglas Epley as chief financial officer (CFO). Will Graven and Deborah Dubree made it clear to Thaddeus Sobarnia, Michael Martin, and Douglas Epley, that their employment agreements did not give them the authority to hire employees, give raises or bonuses, sign checks or contracts, or otherwise obligate the company. Deborah Dubree also believed at the time that even though Will Graven had not yet exercised his option, he had been the de facto chief executive officer (CEO) and had been making all decisions in the company since 2/2005.

In late 9/2005, Deborah Dubree again asked Will Graven if she could retain some ownership. Will Graven agreed. Deborah Dubree indicated she would countersign one of the earlier amendments dated 2/18/2005, which conveyed to her 9.9% ownership in exchange for terminating her employment agreement. Will Graven told Deborah Dubree that because he used ABS as a "springboard" to launch CBS and CBS Aviation, and in the spirit of fairness, he agreed to give Deborah Dubree 9.9% of these companies as well.

2

On 10/5/2005, Will Graven exercised his option and purchased 90.1% of ABS from Deborah Dubree. Will Graven became the significant majority owner and chief executive officer of ABS. Deborah Dubree resigned from the ABS board, and since her employment agreement was terminated, she was no longer entitled to receive any employee-related compensation from ABS. As a 9.9% owner, she was entitled only to a year-end dividend based upon ABS, CBS, and CBS Aviation profitability. Will Graven and Deborah Dubree also reached a mutual understanding that Deborah Dubree would transition out of the company and minimize her contact with ABS employees. She was to be fully removed from ABS effective 12/31/2005. Deborah Dubree represented to Will Graven that her transitioning out of the company was a polite and mutual agreement because she wanted to leave and focus on her new company, Dynamic Wisdom, LLC. Deborah Dubree concealed from Will Graven her feelings of regret for selling the company, which continued to grow.

On 10/10/2005, both Michael Martin and Thaddeus Sobarnia started working for ABS as co-senior vice presidents of operations.

On 10/20/2005, Pamela Johnson started working as controller. Will Graven and Deborah Dubree made it clear to Pamela Johnson that her employment agreement did not give her the authority to hire employees, give raises or bonuses, sign checks or contracts, or otherwise obligate the company.

In mid to late 10/2005, Deborah Dubree learned that Will Graven was pursuing a land development opportunity with the Gila River Indian Community. Deborah Dubree understood at the time that Will Graven was pursuing this opportunity, and others, on his own using companies that were entirely separate from ABS, CBS, and CBS Aviation. Deborah Dubree also understood that Will Graven used resources from ABS, CBS, and CBS Aviation, such as employees, office space, and administrative support, to advance these separate projects, but both Will Graven and Deborah Dubree agreed that all resources used to advance non-ABS projects would be carefully tracked and appropriately allocated so they would be considered when determining ABS profitability.

In mid to late 10/2005, as Will Graven continued to generate new business for ABS, Deborah Dubree started to believe Will Graven had taken advantage of her; Deborah Dubree's feelings of regret started to escalate to feelings of resentment and bitter indignation toward Will Graven.

Between 10/2005 and 12/2005, Deborah Dubree met several times with different members of the ABS executive team including Michael Martin, Daniel Esposito, Thaddeus Sobarnia, and Marc Stricker. Many of these meetings were outside the office at various restaurants and bars, paid for using ABS funds, and took place without Will Graven's knowledge, participation, or authorization. During these meetings:

1. Deborah Dubree shared her feelings of regret and resentment toward Will Graven and expressed a desire to retake control of ABS.

2. Deborah Dubree shared her belief and understanding that, based upon her conversations with Will Graven, ABS was on the brink of closing deals worth hundreds of millions of dollars.

3. Michael Martin and Daniel Esposito told Deborah Dubree that Will Graven was lying to her about the future of ABS, had no experience in construction, was incompetent, was wasting ABS money on private suites and a corporate jet, and had wildly unrealistic ideas for ABS.

4. Deborah Dubree became worried because she had spent so many years working for ABS and saw the company and its employees as her family.

5. These meetings caused Deborah Dubree, Michael Martin, Daniel Esposito, Thaddeus Sobarnia, and Marc Stricker to develop a shared disrespect and hostility toward Will Graven, which fueled rumors throughout the company that attacked Will Graven's credibility and business acumen.

6. Michael Martin, Daniel Esposito, Thaddeus Sobarnia, and Marc Stricker told Deborah Dubree they were more qualified than Will Graven to turn ABS around, and agreed to work together to find a way to force Will Graven out of ABS and take control of the company.

7. Daniel Esposito and Deborah Dubree agreed to work with attorneys at Snell & Wilmer to make specific changes to the ABS shareholders' agreement, without Will Graven's knowledge, to restrict what Will Graven could do with his own shares, make both Deborah Dubree and Daniel Esposito corporate officers of ABS, add both Deborah Dubree and Daniel Esposito to the ABS board, and give Deborah Dubree and Daniel Esposito a clear path to force Will Graven out of ABS and take control of the company.

3

8.  Daniel Esposito assured Deborah Dubree that he could get Will Graven to sign the new shareholder agreement when it was completed.

On or about 12/14/2005, Daniel Esposito told Deborah Dubree that he sent the proposed changes to the ABS shareholders' agreement to Snell & Wilmer for their review and input.

In 12/2005, without Will Graven's knowledge, Deborah Dubree and Michael Martin started looking for a new CFO for ABS because Douglas Epley had told Deborah Dubree he was not interested in helping Deborah Dubree and the ABS executive team to take control of the company.

While Deborah Dubree, Michael Martin, Daniel Esposito, Thaddeus Sobarnia, and Marc Stricker shared a mutual disrespect and hostility toward Will Graven, which fueled their efforts to take control of the company, Deborah Dubree never openly communicated these feelings of disrespect and hostility directly to Will Graven. Instead, she represented herself as a satisfied silent minority owner of ABS, CBS, and CBS Aviation. Michael Martin, Daniel Esposito, Thaddeus Sobarnia, and Marc Stricker also concealed their true feelings and activities from Will Graven, otherwise Will Graven would have immediately terminated them or taken other steps to prevent them from succeeding. Deborah Dubree believes she, Michael Martin, Daniel Esposito, Thaddeus Sobarnia, and Marc Stricker concealed their true feelings and activities so effectively, that there was no reason Will Graven should have suspected anything was wrong.

On multiple occasions, Deborah Dubree and Will Graven also discussed the topic of Will Graven using ABS, CBS, and CBS Aviation resources to advance his other projects separate from ABS, CBS, and CBS Aviation; Deborah Dubree believed and communicated to Will Graven that his approach to allocations was fair and equitable.

Between 12/2005 and 1/2006, without Will Graven's knowledge, Deborah Dubree discussed the planned changes to the ABS shareholders' agreement with several Snell & Wilmer attorneys including Jim Sienicki and Mike Donahey. Attorney Jim Sienicki told Deborah Dubree that in order for Snell & Wilmer to make the requested changes to the ABS shareholders' agreement, both she and Will Graven needed to sign new engagement letters making it clear that Snell & Wilmer did not represent her nor Will Graven, but instead, represented the interests of ABS, CBS, CBS Aviation, and other jointly-owned entities. Prior to this, Deborah Dubree believed Snell & Wilmer represented Will Graven and had a fiduciary responsibility to him, just as she believed that DeConcini McDonald Yetwin & Lacy, P.C., represented her and had a fiduciary responsibility to her.

On 1/24/2006, Deborah Dubree signed a new engagement letter with Snell & Wilmer at the request of Daniel Esposito and Snell & Wilmer Attorney Jim Sienicki. Jim Sienicki explained the engagement letter directly to Deborah Dubree. Deborah Dubree understood that as soon as she and Will Graven signed the new engagement letters, Snell & Wilmer could make the changes to the ABS shareholders' agreement. Deborah Dubree did not pay any of the legal fees associated with Will Graven's attorneys at Snell & Wilmer. Deborah Dubree believes all Snell & Wilmer legal fees were billed to and paid by Will Graven at ABS. At the time, this made sense to Deborah Dubree because Snell & Wilmer were Will Graven's attorneys.

On 3/7/2006, at the urging of Michael Martin and Deborah Dubree, Will Graven hired Michael Groh as the new CFO. Michael Martin told Deborah Dubree that, unlike Douglas Epley, Michael Groh would support and facilitate their efforts to force Will Graven out of the company.

In late 3/2006, Daniel Esposito told Deborah Dubree that he changed his mind about changing the ABS shareholders' agreement to take control of the company. Michael Martin and Daniel Esposito continued to tell Deborah Dubree that Will Graven was incompetent, wasting money, and running ABS into bankruptcy, and that they needed to do something in order to save ABS. Michael Martin and Daniel Esposito also said if they could not take control of ABS, then they all needed to take steps to insulate themselves from the financial liability that would result from an ABS failure.

In late 3/2006 or early 4/2006, in an effort to insulate herself from an ABS failure, Deborah Dubree approached Will Graven and asked if he wanted to buy her 9.9% interest in ABS, CBS, CBS Aviation, and other jointly owned entities, for approximately $1.2 million. Deborah Dubree told Will Graven she wanted the money to continue restructuring and consolidating her personal finances. Will Graven told Deborah Dubree he was surprised that she wanted to sell her shares when there was so much growth on the horizon, but Will Graven said he would consider it.

4

On 4/16/2006, Deborah Dubree sent Will Graven a letter of intent in which she outlined the terms to sell to Will Graven her 9.9% interest in ABS, CBS, CBS Aviation, and other jointly owned entities, for $1,211,900. Will Graven said the price was too high in light of her valuation of 100% of ABS less than one year earlier. Deborah Dubree and Will Graven began to negotiate the terms of a possible buyout.

On 4/26/2006, in a continued effort to insulate herself from a possible ABS failure, Deborah Dubree sent an email to Daniel Esposito and asked if the ABS corporate minutes were completed in 10/2005 to reflect her resignation from the board. She added, "If it's not in place, it needs to be created and backdated."

In about 5/2006, Deborah Dubree also learned that Michael Martin, Daniel Esposito, Michael Groh, Marc Stricker, and Scott Hesse, were forming new companies to pursue ABS leads and projects. She later learned the companies were called DM3 Associates, LLC; DSM Development Group, LLC; Cornerstone Builders, LLC; GEM Construction Group, LLC; and Commercial Steel Systems, LLC.

While continuing to take steps to advance their competing companies and insulate themselves from future liability, Deborah Dubree, Michael Martin, Daniel Esposito, Michael Groh, Marc Stricker, and Scott Hesse, also decided to apply increased financial and legal pressure onto Will Graven so that he might abandon and walk away from ABS. Michael Martin and Daniel Esposito encouraged Deborah Dubree to solicit help from DeConcini McDonald Yetwin & Lacy, P.C.

In about 6/2006, Deborah Dubree and Michael Martin talked with Attorney Michael Cordier from DeConcini McDonald Yetwin & Lacy, P.C. Deborah Dubree and Michael Martin told Michael Cordier that Will Graven was misappropriating money; wiring funds to Mexico for illicit purposes; wasting company money on his girlfriend, private jets, athletic arena suites, and new companies; and intended to drive ABS into bankruptcy and abscond with whatever money was left in the accounts.

On 7/24/2006, based on the information he received from Michael Martin and Deborah Dubree, Attorney Michael Cordier sent a letter to Will Graven demanding that Will Graven place an anticipated $10 million payment from the project in Victorville, California, under the joint control of Will Graven and Deborah Dubree, or buy out Deborah Dubree for $1.5 million. Deborah Dubree believes the objective of the demand letter was to apply so much financial and legal pressure onto Will Graven that he would either walk away and abandon ABS, or pay her $1.5 million for her share of the companies. Deborah Dubree, Michael Martin, Daniel Esposito, Michael Groh, Marc Stricker, and Scott Hesse, had agreed that if and when Will Graven walked away and abandoned ABS, Michael Martin, Daniel Esposito, Michael Groh, Marc Stricker, and Scott Hesse would collectively own 80% of ABS and would take over day-to-day operations, and Deborah Dubree would own 20% of ABS and would be a silent partner.

In early 8/2006, after 7-10 days of tense negotiations with Michael Cordier, during which Deborah Dubree and Michael Cordier threatened to force ABS into receivership, Will Graven verbally agreed to buy out Deborah Dubree's 9.9% interest in ABS, CBS, CBS Aviation, and other jointly owned companies, for $1.5 million plus $300,000 toward dividends (the Buyout Agreement).

On 8/16/2006, Will Graven paid Deborah Dubree $300K in dividends pursuant to the Buyout Agreement.

On 8/31/2006, Will Graven made the first $20,000 payment toward the $1.5 million owed to Deborah Dubree pursuant to the Buyout Agreement.

On or about 9/1/2006, Will Graven and Deborah Dubree signed the Buyout Agreement.

On 10/20/2006, Will Graven made another $20,000 payment toward the $1.5 million owed to Deborah Dubree pursuant to the Buyout Agreement.

On 12/26/2006, Will Graven made two $20,000 payments toward the $1.5 million owed to Deborah Dubree pursuant to the Buyout Agreement.

On 11/9/2007, Deborah Dubree filed a false amendment with the ACC claiming that she sold her interest in ABS on 1/1/2006, when in fact, she had sold her interest on 9/1/2006. Deborah Dubree filed this amendment because she was receiving several harassing letters and phone calls from ABS creditors.

State of Arizona vs. Deborah Dubree
Case Number:  CR 2014-001649-006
PLEA AGREEMENT

Deborah Dubree has reviewed the emails and documents associated with this investigation and believes the documents related to her are authentic.

## AS TO COUNT 1

On or between October 5, 2005 and March 28, 2005, Deborah Dubree, knowingly accepted or agreed to accept any pecuniary benefit as consideration for refraining from reporting to law enforcement authorities the commission or suspected commission of any felony offense or information relating to an offense.

I have personally and voluntarily placed my initials in each of the above boxes and signed the signature line below to indicate I read and approved all of the previous paragraphs in this agreement, both individually and as a total binding agreement.

Date: _4/22/16_          Defendant _____
                                        Deborah Dubree

I have discussed this case with my client in detail and advised him of his constitutional rights and all possible defenses. I believe that the plea and disposition set forth herein are appropriate under the facts of this case. I concur in the entry of the plea as indicated above and on the terms and conditions set forth herein.

Date: _4/22/15_          Defense Counsel _____
                                        Milo Iniguez

I have reviewed this matter and concur that the plea and disposition set forth herein are appropriate and are in the interests of justice.

Date: _4-22-15_          Prosecutor _____
                                        Joseph Waters

6

# Plaintiff Will Graven's Complaint

## Case No.:  CV2019-_____

## Filed June 28, 2019

## Assigned for all practical purposes to the Honorable

---

*Will Graven,*

Plaintiff,

*v.*

*State of Arizona,*

Defendants,

in

United Sates District Court,
District of Arizona,
Phoenix Division.

# Exhibit 4

*CASE OPENING SHEET*

Legal Files Number:   P0022015000615        GJ#           CR#
ASSIGNED SECTION CODE: FSP            DATE CASE RECD.: 04/28/2015

LIST ALL SUSPECTS NAMES, BUSINESS *(including full name, aka, dba, etc.)*
Snell & Wilmer, LLP
Esposito, Daniel V (Dan) Esq.
Kastin, William A.
Ohre, Mark D.
Sienicki, James

CHARGES:  Fraud

SPECIFIC FACTUAL ALLEGATIONS *(including suspected offenses and dates)*
Between 12/14/2005 and 3/28/2006, Snell & Wilmer Attorneys Jim Sienicki, Mark Ohre,
And Bill Kastin conspired with 9.9% owner of Arizona Building Systems, Inc. (ABS),
Deborah Dubree; and ABS General Counsel Daniel Esposito, to modify the ABS
shareholders' agreement to give Deborah Dubree and Daniel Esposito control over ABS.
Jim Sienicki, Mark Ohre, Bill Kastin, Deborah Dubree, and Daniel Esposito, concealed
the modifications from Snell & Wilmer client and 90.1% owner of ABS, Will Graven.

Between 6/13/11 and 2/21/13 Snell & Wilmer attorneys continued to conceal the above-
described activity by misleading Will Graven and the court during a civil lawsuit and
failing to preserve severall emails and documents.

STATUTE OF LIMITATION RUNS? 2018
ESTIMATED LOSS:  Unknown       ESTIMATED ASSET RECOVERY: Unknown
ESTIMATED NUMBER OF VICTIMS: 1
ASSIGNED INVESTIGATOR:  Special Agent Dan Woods
AGENCY: AGO/SIS                          DR #P2015-0615

DATE CHARGES FILED: _____          NEXT COURT DATE:

APPROVED: _____          DATE_____
            *(Section Chief)*

APPROVED: _____          DATE  5/6/15
            *(Division Chief)*

ASSIGNED TO:  Joseph Waters        AAG INITIALS_____      DATE_____

Conflict Check Done by: g. Martinez           DATE: 4/29/15

If the Office of the Attorney General is to conduct any investigation in this case, the Case Opening Sheet
must be approved by the Criminal Division Chief Counsel before any investigation is conducted.

# CASE TYPE
## (for Statistical Tracking)

☐ (AHCCCS) Code:        Description:

☐ Abuse          Code:        Description:

☐ Administrative

☐ Amicus Curiae

☐ Assault              Description:

☐ Bribery              Description:

☐ Burglary

☐ Computer Forensics

☐ Conflict of Interest

☐ Consumer Fraud        Description:

☐ Criminal Enterprise

☐ Destruction of Public Records

☐ Disorderly Conduct

☐ Drugs            Description:

☐ Embezzlement

☐ Environmental Crime   Description:

☐ Financial Exploitation

☐ Foreign Prosecution   Description:

☐ Forfeiture

X Fraud                Description:

☐ Gambling

☐ Gang            Description:

☐ Habeas Corpus

☐ Harassment

☐ Hate Crimes

☐ Hindering Prosecution

☐ Homicide            Description:

☐ Human Smuggling

☐ Investigation – Information Only

☐ Juvenile            Description:

☐ Larceny

☐ Maricopa HIDTA/Provisional HIDTA

☐ Misappropriation of Public Money

☐ Misconduct          Description:

☐ Money Laundering

☐ Money Transmitters

☐ Murder            Description:

☐ Negligent Homicide

☐ Nepotism

☐ Obstruction of Justice

☐ Open Meeting Law Violation

☐ Post Conviction Relief

☐ Public Corruption

☐ Racketeering-Financial Gain

☐ Robbery            Description:

☐ Sexual Conduct-Minor

☐ Sexually Violent Predator

☐ Special Action

☐ Technology Crimes   Description:

☐ Telemarketing

☐ Terrorism

☐ Theft              Description:

☐ Trafficking – Stolen Property

☐ Wiretap

4440291

# Plaintiff Will Graven's Complaint

## Case No.:  CV2019-_____

## Filed June 28, 2019

## Assigned for all practical purposes to the Honorable

_____

*Will Graven,*

Plaintiff,

*v.*

*State of Arizona,*

Defendants,

in

United Sates District Court,
District of Arizona,
Phoenix Division.

# Exhibit 5

Imaged 4/29/15

STATE OF ARIZONA
OFFICE OF THE ATTORNEY GENERAL
SPECIAL INVESTIGATIONS

CASE OPENING FORM

**For Office Use Only**
- Conflict Check ☑
- Name Cards ☑
- File Set-Up ☑
- File Related People ☑
- File Manager ☑
- Case Phase ☑
- Physical File Location ☑  V64ba15

**Check One**          PHX-#4426036

☑ Open Case

☐ Open & Close
(Info Only Report)
NO Case Closing Required

LF No.: P-2015-0615                    Open Date: 4/22/2015

Case Name:  Snell & Wilmer          ☑ Suspect
                                     ☐ Victim
                                     ☐ Complainant

Other Suspects/Suspect Business/Victims to be Indexed (Please Indicate Role in Case (S), (V), (W))

| Role | l. Name | F Name | M Name | DOB | SSN |
|------|---------|--------|--------|-----|-----|
| (S) | Snell & Wilmer, LLP | | | | |
| (S) | Sjenicki | James | Joseph | ▓▓▓▓ | ▓▓▓▓ |
| (S) | Ohre | Mark | Daniel | ▓▓▓▓ | ▓▓▓▓ |
| (S) | Kastin | William | Andrew | ▓▓▓▓ | ▓▓▓▓ |
| (S) | Esposito | Daniel | Vincent | ▓▓▓▓ | ▓▓▓▓ |
| (W) | Dubree | Deborah | Marie | ▓▓▓▓ | ▓▓▓▓ |
| (V) | Graven | William | Andrew | ▓▓▓▓ | |

| Law Enforcement Assist? ☑ NO  ☐ YES | Type of Report: | |
|---|---|---|
| If Yes, Agency: | Conspiracy to commit fraud | |

| Assigned Agent(s) | Supervisor | Assigned Attorney |
|---|---|---|
| D. Woods   376 | A. Rubalcava   346 | J. Waters |

**No investigation is to proceed until this form is approved by the Criminal Division Chief.**

| Chief Special Agent | Approval | Chief Counsel | Approval |
|---|---|---|---|
| Andrew Rubalcava | AV | Donald Conrad | DRC |

| Is the subject of the investigation a client agency, an elected official, governmental entity and/or a matter of political sensitivity? | YES ☑ |
|---|---|
| | NO ☐ |

Synopsis of Allegation/Complaint (include approx. dates of offense, estimated loss, estimated number of victims):

Between 12/14/2005 and 3/28/2006, Snell & Wilmer Attorneys Jim Sienicki, Mark Ohre, and Bill Kastin conspired with 9.9% owner of Arizona Building Systems, Inc. (ABS), Deborah Dubree; and ABS General Counsel Daniel Esposito, to modify the ABS shareholders' agreement to give Deborah Dubree and Daniel Esposito control over ABS. Jim Sienicki, Mark Ohre, Bill Kastin, Deborah Dubree, and Daniel Esposito, concealed the modifications from Snell & Wilmer client and 90.1% owner of ABS, Will Graven.

Between 6/13/2011 and 2/21/2013, Snell & Wilmer attorneys continued to conceal the above-described activity by misleading Will Graven and the Court during a civil lawsuit and failing to preserve several emails and documents.

# Plaintiff Will Graven's Complaint

## Case No.:  CV2019-_____

## Filed June 28, 2019

## Assigned for all practical purposes to the Honorable

_____

*Will Graven,*

Plaintiff,

*v.*

*State of Arizona,*

Defendants,

in

United Sates District Court,
District of Arizona,
Phoenix Division.

# Exhibit 6

Rodriguez, Lisa

| | |
|---|---|
| **From:** | Rodriguez, Lisa |
| **Sent:** | Thursday, April 30, 2015 3:57 PM |
| **To:** | Brnovich, Mark; Bailey, Michael; Ahler, Paul; Rubalcava, Andy; Buhrow, Lauren; Womack, Stephen; Dailey, Mike; Woods, Dan; Waters, Joseph; Perkins, Jennifer |
| **Cc:** | Conrad, Donald; Martinez, Gilda; Maya, Autumn; Sherman, Tanika; Rivas, Dominique; Rodriguez, Lisa |
| **Subject:** | RE: Screen for Paul Ahler from cases involving Will Graven |
| **Importance:** | High |

Please note: P-2015-0615 is also screened from Paul Ahler.  Please make sure to mark your LF cases.  Thanks. Lisa

**From:** Rodriguez, Lisa
**Sent:** Thursday, April 30, 2015 3:34 PM
**To:** Brnovich, Mark; Bailey, Michael; Ahler, Paul; Rubalcava, Andy; Buhrow, Lauren; Womack, Stephen; Dailey, Mike; Woods, Dan; Waters, Joseph; Perkins, Jennifer
**Cc:** Rodriguez, Lisa; Conrad, Donald; Martinez, Gilda; Maya, Autumn; Sherman, Tanika; Rivas, Dominique
**Subject:** Screen for Paul Ahler from cases involving Will Graven

All - Please see attached screening memo.  Thanks. Lisa

1

# ATTORNEY GENERAL
## Criminal Division

# MEMORANDUM

### CONFIDENTIAL

TO:  Mark Brnovich
Attorney General

Mike Bailey
Chief Deputy/Chief of Staff

Paul Ahler                                    Joe Waters
FSP Section Chief Counsel                      FSP Assistant Attorney General

Andy Rubalcava                                 Dan Woods
Chief Agent                                    Assistant Chief Agent

Lauren Buhrow                                  Mike Dailey
Special Agent                                  FRS Section Chief Counsel

Stephen Womack                                 Jennifer Perkins
FRS Assistant Attorney General                 Assistant Solicitor General

FROM:   Donald E. Conrad
Criminal Division Chief Counsel

DATE:   April 27, 2015

RE:     Screen for Paul Ahler from Graven
P002-2011-002341 - Fraud
P002-2013-001134 - Fraud
P002-2014-000600 – Forfeiture #1
P002-2014-001290 – Forfeiture #2

The Arizona Attorney General's Office is investigating and prosecuting a case related to AGO CRM Legal File numbers: P002-2001-002341/P002-2013-001134 – Fraud and P002-2014-000600/P002-2014-001290 – Forfeiture.  Possible targets of the investigation include Snell & Wilmer and lawyers with that firm, including James Sienicki, Mark Ohre and William Kastin.  Paul Ahler, Fraud & Special Prosecution's Section Chief Counsel, notified AAG Joseph Waters that he has a conflict of interest related to Snell & Wilmer.  Paul Ahler is to be screened from this matter, and will not receive any information about the case or participate in any discussions of or decisions relating to this case.  I will be the point of contact for any matters relating to this investigation and/or prosecution.

This memorandum is provided to you, including those listed below as receiving copies of this memorandum, as the persons who have or potentially will have information concerning this investigation.

The following steps must be followed by each of you:

☒ No information, discussion, or decisions regarding #P002-2001-002341/P002-2013-001134 – Fraud and #P002-2014-000600/P002-2014-001290 – Forfeiture or related matters may be conveyed to Paul Ahler.

☒ All files maintained in and related to #P002-2001-002341/P002-2013-001134 – Fraud and #P002-2014-000600/P002-2014-001290 – Forfeiture or related matters shall be prominently marked to denote that the file shall be screened from Paul Ahler.

☒ All computer records relating to #P002-2001-002341/P002-2013-001134 – Fraud and #P002-2014-000600/P002-2014-001290 – Forfeiture or related matters shall be restricted from access by Paul Ahler. In the event that Mr. Ahler inadvertently accesses any computer records pertaining to the matter, he will immediately close out of the computer record and notify me.

☒ All staff persons working with the above listed person shall be provided a copy of this memorandum and instructed that they are not to communicate in any manner with Paul Ahler regarding #P002-2001-002341/P002-2013-001134 – Fraud and #P002-2014-000600/P002-2014-001290 – Forfeiture or related matters.

If any person, other than the recipients of this memorandum listed above, receives responsibilities in the future with regard to #P002-2001-002341/P002-2013-001134 – Fraud and #P002-2014-000600/P002-2014-001290 – Forfeiture, the supervisor or person with primary responsibility for this matter shall provide that person with a copy of this memorandum, and document in writing that the memorandum was provided. This directive includes any and all staff who may work on the matter.

cc:    Lisa Rodriguez, Legal Administrator
       Gilda Martinez, FSP OA
       Autumn Maya, SIS OA
       Tanika Sherman, FSP LA
       Dominque Rivas, AGO SGJ Clerk

#220584-v29

# Plaintiff Will Graven's Complaint

## Case No.:  CV2019-_____

## Filed June 28, 2019

## Assigned for all practical purposes to the Honorable

_____

*Will Graven,*

Plaintiff,

*v.*

*State of Arizona,*

Defendants,

in

United Sates District Court,
District of Arizona,
Phoenix Division.

# Exhibit 7

#14

## CASE CHARGING APPROVAL

Complaint: _____   Indictment: XX   Estimated Length of Trial: 14 Days

Grand Jury Presentment / Direct Complaint: Date and Time: July 22, 2015

Name of Defendant: Michael Martin and Daniel Esposito

CHARGES:

COUNT 1: CONSPIRACY, Class 2 Felony, in violation of A.R.S. § 13-1003
(Defendant 001 & 002)

COUNT 2: CONSPIRACY, Class 2 Felony, in violation of A.R.S. § 13-1003
(Defendant 002)

COUNTS 3-9: FRAUDULENT SCHEMES & ARTIFICES, Class 2 Felonies, in
violation of A.R.S. § 13-2310
(Defendant 001 & 002)

COUNT 10: FRAUDULENT SCHEMES & ARTIFICES, Class 2 Felony, in violation
of A.R.S. § 13-2310
(Defendant 001)

COUNT 11 & 12: THEFT, Class 2 Felonies, in violation of A.R.S. § 13-1802
(Defendant 001 & 002)

COUNT 13: THEFT, Class 3 Felony, in violation of A.R.S. § 13-1802
(Defendant 001 & 002)

If drug related: N/A          Weight: N/A

Name(s) of Victim(s): **Arizona Building Systems**

County: **Maricopa**          Date of Offense: October 1, 2005 and May 3, 2007

Statute of Limitations: **November 2018**

Summary of Case and Evidence Available:

Arizona Building Systems (ABS) is owned by Will Graven. ABS is a steel fabrication
and construction business. From 2005 to 2007, Will Graven's business was
systematically dismantled by his executive team (Michael Martin and Daniel Esposito)
with the intent of forming a competing business. During this time frame executive
members pillaged ABS. ABS was decimated by a series of unauthorized spending and

compensation to employees and the executive team that was not authorized by the owner, Will Graven[1].

During the same timeframe as the unauthorized compensation, Daniel Esposito attempted to use attorneys at Snell & Wilmer to steal control over ABS, which will be outlined below. When this failed, Michael Martin, Daniel Esposito, and Michael Groh[2] formed two competing businesses, DSM and Commercial Steel Systems (CSS). DSM and CSS were created to perform steel fabrication and construction. DSM was the first entity that the executive teamed used to attempt to steal business from ABS and ceased operating by January of 2007. CSS was the second entity that was created after DSM failed and operated until 2011.

The investigation by S.A. Woods was completed by obtaining partial emails saved on the Exchange server of ABS[3], search warrants of previous ABS employees who kept email personal storage table (PST) files related to their ABS employment, and witness interviews. Subpoenas were also obtained for bank documentation and for any other material referenced below. Finally, search warrants at Michael Martin and Michael Groh's residence located ABS records that ABS could not provide to the investigation due to the records being destroyed.[4] Based upon this information, S.A. Woods investigated three projects that DSM stole intellectual property of ABS and five projects that CSS stole the intellectual property of ABS. The intellectual property was subsequently used at DSM and CSS. Based upon a review of the emails, these projects were identified as projects to steal from ABS because Michael Martin was left behind to hide the existence of any corporate espionage and theft by DSM and CSS. Will Graven was never aware that DSM or CSS existed and never gave permission for ABS intellectual property to be used at DSM or CSS.

**Snell and Wilmer**

In December of 2005, Daniel Esposito, the legal counsel for ABS, was working with outside counsel for ABS, Snell & Wilmer, on a variety of projects related to ABS and to Will Graven. From December 2005 to March of 2006, Daniel Esposito conspired with the minority owner of ABS, Deborah Dubree, to have Snell & Wilmer re-write the corporate documents for ABS in an attempt to limit the power of Will Graven as the owner of ABS and to force Will Graven out as owner of ABS. Emails sent by Daniel

---

[1] The unauthorized compensation is currently being prosecuted and is set for trial in August of 2015. This new indictment will be joined with the unauthorized compensation indictment and the trial date will be reset.

[2] Michael Groh entered into a cooperation agreement with the State and will testify against Michael Martin and Daniel Esposito. He corroborated the investigation completed by S.A. Woods.

[3] Complete records of email could not be obtained due an unknown party hacking into ABS and deleting files associated with email.

[4] Witnesses have identified Daniel Esposito, Michael Martin, and Michael Groh as shredding numerous ABS documents. In addition, prior to Daniel Esposito resigning from ABS, he brought home numerous ABS legal documents claiming to have worked on them. When he resigned, he never returned the documents.

Esposito to Deborah Dubree confirm their intention as well as Deborah Dubree's testimony as obtained through a testimonial agreement.

## DSM PROJECTS

### RCR Project

In June of 2006, consultants brought a construction project relating to building a solid waste disposal facility to Michael Martin. The consultants brought this project to Michael Martin in his capacity as the owner of DSM. The value of this project was $350,000. Michael Martin, Daniel Esposito, and Michael Groh actively worked the project with their competing company while employed at ABS. The executive team worked on the project during ABS business hours and while purporting to be loyal employees to ABS and receiving compensation from ABS. In addition, the executive team was using the resources of ABS to pursue this project.

### Data Center Project

In March of 2006, Michael Martin obtained project information regarding a data center worth approximately $70 million dollars. In May of 2006, Michael Martin approached Will Graven about a promising opportunity to build a data center and that ABS would make a ten percent profit on the project. ABS began to pay expenses and dedicated employee resources to this project. At the same time, DSM listed the Data Center as a project in their 2006 operating budget. The executive team emailed ABS intellectual property to their DSM emails in order to use DSM in an attempt to win the project.

### Victorville Project

In June of 2005, representatives from the City of Victorville in California spoke with Will Graven about ABS building airport hangers for the city, potentially worth millions for ABS. Construction of the hangers began and substantial progress was being made. Eventually the city and ABS had a falling out over the building of the hangers as the city was not able to afford the construction and began to blame ABS for the lack of progress. The city and ABS were working on a mutual release and settlement agreement for the two parties to terminate the agreement to build the hangers. In April of 2006, the executive team was attempting to take the hanger project to their business, DSM. Michael Martin, Michael Groh, and Daniel Esposito were working together to secure ABS intellectual property and to use it at DSM to win the remainder of the hanger project. The executive team was working on obtaining this project while getting paid by ABS. In addition, the executive team was pressuring Will Graven to enter into the release agreement in order to further their plans. Will Graven never gave authorization for anyone other than ABS to use ABS intellectual property.

## CSS PROJECTS

### Circle G Pegasus Project

In late 2005, ABS began to pursue a project with Circle G Pegasus. Several ABS employees were paid by ABS and used ABS resources to pursue the project. In May of 2006, ABS received a signed letter of intent from Circle G Pegasus. Based upon this information, ABS ordered doors and steel for the project. In June of 2006, the contract between ABS and Circle G Pegasus was reviewed by Daniel Esposito. This contract was never presented to Will Graven for his signature. Instead, ABS intellectual property related to this project was stolen by CSS. The executive team of ABS informed Circle G Pegasus that ABS could not afford to complete the project and that ABS was going out of business. The ABS intellectual property was used by CSS to win the Circle G Pegasus Project which was valued at $1.2 million.

## Bioscience Project

Between March of 2006 and November of 2006, ABS employees began work for a request to handle the metal walls for the Phoenix Union Bioscience School. Based upon an interview of the owner of the general contractor for this project, the contract with ABS was revoked because they were told by an employee at ABS that ABS was going out of business and that a new company, CSS, would complete the project.[5] The executive team of ABS used the intellectual property of ABS at CSS to win this project worth approximately $102,337.

## Kabookies Project

In late 2006, ABS employees were working on a project as a subcontractor for an architect firm. The project was aid in the design and build of a steel building for Kabookies, a sushi restaurant. The intellectual property used to create the designs for Kabookies was stolen by CSS and used by CSS to win the design phase of the Kabookies which was valued at $19,878. The owners of Kabookies decided not to go forward with the project and CSS did not have the opportunity to win the build phase.

## Big League Dreams Project

In late 2005, ABS engaged with Mortenson Construction to be a subcontractor for the design and building of small maintenance building and a large indoor sports pavilion at this sports complex. ABS created intellectual property during the bidding process in an attempt to win the project. Mortenson Construction awarded the contract to ABS and the last part of the process was for ABS to bond the job and sign the contract. Rather than brining the bonding issue to Will Graven, the executive team undermined the project by not returning calls or emails, and then they stole the ABS intellectual property. CSS used the ABS intellectual property in order to attempt to win the contract with Mortenson Construction. However, Mortenson Construction did not want any part of what they believed CSS was doing, which was undermining ABS and stealing their intellectual property. If CSS won this project, they would have obtained $500,000 to $1.2 million.

---

[5] ABS was not going out of business based upon witness interviews and emails. However, the theft of projects did lead to ABS going out of business in June of 2007.

**W.W. Williams Project**
In early 2006, the W.W. Williams Company was attempting to locate a general contractor and was seeking bids from three different businesses, one business being ABS. The project was valued at $2.5 million. ABS began to generate intellectual property during the bidding process. During the bidding process, Michael Martin provided the intellectual property that ABS was generating to Michael Groh who was no longer working at ABS. This intellectual property was provided to Hayward Builders who inflated the bid arbitrarily and named the bid as a joint ABS/Hayward bid for the W.W. Williams Project. Per Michael Groh, Hayward was only going to work on the project and the executive team would profit from winning the bid, not ABS. W.W. Williams did not award the bid to the executive team based upon the inflated prices and for not notifying W.W. Williams about a joint venture with Hayward Builders.

Amount of Loss: >$1,000,000

Forfeiture/Seizure: **None**                                    Plea Offers to Date: **None**

Case Agent: **Dan Woods**          Agency: **AGO SIS**

If Warrant: ___X___ NCIC _____ AZ Only

Submitted by Assistant Attorney General: **Joseph Waters**    Date: **6/29/2015**

APPROVALS

_____     _____
Section Chief Counsel                Date

_____     _____
Chief Counsel, Criminal Division     Date
#4514539v1

# Plaintiff Will Graven's Complaint

## Case No.:  CV2019-_____

## Filed June 28, 2019

## Assigned for all practical purposes to the Honorable

_____

*Will Graven,*

Plaintiff,

*v.*

*State of Arizona,*

Defendants,

in

United Sates District Court,
District of Arizona,
Phoenix Division.

# Exhibit 8

BY CHRIS DEROSE, CLERK
DEP

M ____, _ED

19 JAN 23 PM 4: 20

MARK BRNOVICH
Attorney General
Firm Bar No 14000

JOSEPH W WATERS
State Bar No 025819
MARY HARRISS
State Bar No 014462
Assistant Attorney General
2005 N Central Ave
Phoenix, Arizona 85004-1592
Telephone 602-542-3881
crmfraud@azag gov

Attorney for Plaintiff



## IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

## IN AND FOR THE COUNTY OF MARICOPA

| | |
|---|---|
| STATE OF ARIZONA,<br><br>　　　　Plaintiff,<br><br>v<br><br>**LAURA TENISON SMITH,**<br><br>　　　　Defendant | Case No   **CR2018-001934-001**<br><br>**84 SGJ 96**<br><br>**INDICTMENT**<br>CHARGING VIOLATIONS OF<br><br>**COUNTS 1-3: FRAUDULENT SCHEMES AND PRACTICES,** Class 5 Felonies, in violation of A R S § 13-2310<br><br>**COUNTS 4-12: CONFLICT OF INTEREST,** Class 6 Felonies, in violation of A R S § 38-503 |

The Arizona State Grand Jury accuses, **LAURA TENISON SMITH**, charging on this 23rd day of January, 2019, that in or from Maricopa County, Arizona

## COUNT 1
## FRAUDULENT SCHEMES AND PRACTICES

On or about February 24, 2017, **LAURA TENISON SMITH,** in any matter related to the business conducted by any department or agency of this state or any political subdivision thereof, pursuant to a scheme or artifice to defraud or deceive,

knowingly falsified, concealed or covered up a material fact by any trick, scheme or device or made or used any false writing or document knowing such writing or document contains any false, fictitious or fraudulent statement or entry, in violation of A R S §§13-2311, 13-701, 13-702 and 13-801

To wit  While employed as the Chief Financial Officer of the Scottsdale Unified School District, **LAURA TENISON SMITH** concealed or covered up the material fact that her sister, Caroline Brackley, owned the Professional Group Public Consulting Inc in the Staff Conflict of Interest document

## COUNT 2
## FRAUDULENT SCHEMES AND PRACTICES

On or about May 1, 2017, **LAURA TENISON SMITH**, in any matter related to the business conducted by any department or agency of this state or any political subdivision thereof, pursuant to a scheme or artifice to defraud or deceive, knowingly falsified, concealed or covered up a material fact by any trick, scheme or device or made or used any false writing or document knowing such writing or document contains any false, fictitious or fraudulent statement or entry, in violation of A R S §§13-2311, 13-701, 13-702 and 13-801

To wit  While employed as the Chief Financial Officer of the Scottsdale Unified School District, **LAURA TENISON SMITH** concealed or covered up the material fact that her sister, Caroline Brackley, owned the Professional Group Public Consulting Inc in the Conflict of Interest Disclosure Memorandum

## COUNT 3
## FRAUDULENT SCHEMES AND PRACTICES

On or about May 3, 2017, **LAURA TENISON SMITH**, in any matter related to the business conducted by any department or agency of this state or any political subdivision thereof, pursuant to a scheme or artifice to defraud or deceive, knowingly

2                                    #6932179

falsified, concealed or covered up a material fact by any trick, scheme or device or made or used any false writing or document knowing such writing or document contains any false, fictitious or fraudulent statement or entry, in violation of A R S §§13-2311, 13-701, 13-702 and 13-801

To wit  While employed as the Chief Financial Officer of the Scottsdale Unified School District, **LAURA TENISON SMITH** concealed or covered up the material fact that her sister, Caroline Brackley, owned the Professional Group Public Consulting Inc in the Conflict of Interest Disclosure Memorandum

## COUNT 4
## CONFLICT OF INTEREST

On or about March 30, 2017, **LAURA TENISON SMITH**, a public officer or employee of a public agency, knowingly had, or whose relative had, a substantial interest in any decision of a public agency failed to make known such interest in the official records of such public agency and failed to refrain from participating in any manner as an officer or employee in such decision, to wit  Purchase Order #1703885, in violation of A R S §§38-503, 38-502, 38-510, 13-701, 13-702, 13-703, 13-801, and 13-811

To wit  While an employee of Scottsdale Unified School District, **LAURA TENISON SMITH** failed to disclose that her sister, Caroline Brackley, owned the Professional Group Public Consulting Inc and **LAURA TENISON SMITH** approved payment to the Professional Group Public Consulting Inc by approving ~~Purchase~~ Order #1703885

## COUNT 5
## CONFLICT OF INTEREST

On or about April 13, 2017, **LAURA TENISON SMITH**, a public officer or employee of a public agency, knowingly had, or whose relative had,  a substantial interest in any decision of a public agency failed to make known such interest in the official

3                                        #6932179

records of such public agency and failed to refrain from participating in any manner as an officer or employee in such decision in violation of A R S §§38-503, 38-502, 38-510, 13-701, 13-702, 13-703, 13-801, and 13-811

To wit   While an employee of Scottsdale Unified School District, **LAURA TENISON SMITH** failed to disclose that her sister, Caroline Brackley, owned the Professional Group Public Consulting Inc  and **LAURA TENISON SMITH** approved payment to the Professional Group Public Consulting Inc  by approving ~~Change~~ Order #1704291

## COUNT 6
### CONFLICT OF INTEREST

On or about May 16, 2017, **LAURA TENISON SMITH**, a public officer or employee of a public agency, knowingly had, or whose relative had,  a substantial interest in any decision of a public agency failed to make known such interest in the official records of such public agency and failed to refrain from participating in any manner as an officer or employee in such decision in violation of A R S §§38-503, 38-502, 38-510, 13-701, 13-702, 13-703, 13-801, and 13-811

To wit   While an employee of Scottsdale Unified School District, **LAURA TENISON SMITH** failed to disclose that her sister, Caroline Brackley, owned the Professional Group Public Consulting Inc  and **LAURA TENISON SMITH** approved payment to the Professional Group Public Consulting Inc  by approving Change Order #1704119

## COUNT 7
### CONFLICT OF INTEREST

On or about May 16, 2017, **LAURA TENISON SMITH**, a public officer or employee of a public agency, knowingly had, or whose relative had,  a substantial interest in any decision of a public agency failed to make known such interest in the official

4                                     #6932179

records of such public agency and failed to refrain from participating in any manner as an officer or employee in such decision in violation of A R S  §§38-503, 38-502, 38-510, 13-701, 13-702, 13-703, 13-801, and 13-811

To wit  While an employee of Scottsdale Unified School District, **LAURA TENISON SMITH** failed to disclose that her sister, Caroline Brackley, owned the Professional Group Public Consulting Inc  and **LAURA TENISON SMITH** approved payment to the Professional Group Public Consulting Inc  by approving Change Order #1704291

**COUNT 8**
**CONFLICT OF INTEREST**

On or between May 16, 2017 and May 25, 2017, **LAURA TENISON SMITH**, a public officer or employee of a public agency, knowingly had, or whose relative had,  a substantial interest in any decision of a public agency failed to make known such interest in the official records of such public agency and failed to refrain from participating in any manner as an officer or employee in such decision in violation of A R S  §§38-503, 38-502, 38-510, 13-701, 13-702, 13-703, 13-801, and 13-811

To wit  While an employee of Scottsdale Unified School District, **LAURA TENISON SMITH** failed to disclose that her sister, Caroline Brackley, owned the Professional Group Public Consulting Inc  and **LAURA TENISON SMITH** approved payment to the Professional Group Public Consulting Inc  by approving Purchase Order #1704841

**COUNT 9**
**CONFLICT OF INTEREST**

On or about September 15, 2017, **LAURA TENISON SMITH**, a public officer or employee of a public agency, knowingly had, or whose relative had,  a substantial interest in any decision of a public agency failed to make known such interest in the official

5

#6932179

records of such public agency and failed to refrain from participating in any manner as an officer or employee in such decision in violation of A R S §§38-503, 38-502, 38-510, 13-701, 13-702, 13-703, 13-801, and 13-811

To wit  While an employee of Scottsdale Unified School District, **LAURA TENISON SMITH** failed to disclose that her sister, Caroline Brackley, owned the Professional Group Public Consulting Inc  and **LAURA TENISON SMITH** approved payment to the Professional Group Public Consulting Inc  by approving Purchase Order #1801951

## COUNT 10
## CONFLICT OF INTEREST

On or about September 28, 2017, **LAURA TENISON SMITH**, a public officer or employee of a public agency, knowingly had, or whose relative had,  a substantial interest in any decision of a public agency failed to make known such interest in the official records of such public agency and failed to refrain from participating in any manner as an officer or employee in such decision in violation of A R S §§38-503, 38-502, 38-510, 13-701, 13-702, 13-703, 13-801, and 13-811

To wit  While an employee of Scottsdale Unified School District, **LAURA TENISON SMITH** failed to disclose that her sister, Caroline Brackley, owned the Professional Group Public Consulting Inc  and **LAURA TENISON SMITH** approved payment to the Professional Group Public Consulting Inc  by approving Purchase Order #1802155

## COUNT 11
## CONFLICT OF INTEREST

On or about October 4, 2017, **LAURA TENISON SMITH**, a public officer or employee of a public agency, knowingly had, or whose relative had,  a substantial interest in any decision of a public agency failed to make known such interest in the official

6                                                      #6932179

records of such public agency and failed to refrain from participating in any manner as an officer or employee in such decision, to wit Purchase Order #1802327, in violation of A R S §§38-503, 38-502, 38-510, 13-701, 13-702, 13-703, 13-801, and 13-811

To wit  While an employee of Scottsdale Unified School District, **LAURA TENISON SMITH** failed to disclose that her sister, Caroline Brackley, owned the Professional Group Public Consulting Inc  and **LAURA TENISON SMITH** approved payment to the Professional Group Public Consulting Inc  by approving Purchase Order #1802327

### COUNT 12
### CONFLICT OF INTEREST

On or about October 30, 2017, **LAURA TENISON SMITH**, a public officer or employee of a public agency, knowingly had, or whose relative had,  a substantial interest in any decision of a public agency failed to make known such interest in the official records of such public agency and failed to refrain from participating in any manner as an officer or employee in such decision in violation of A R S  §§38-503, 38-502, 38-510, 13-701, 13-702, 13-703, 13-801, and 13-811

To wit  While an employee of Scottsdale Unified School District, **LAURA TENISON SMITH** failed to disclose that her sister, Caroline Brackley, owned the Professional Group Public Consulting Inc  and **LAURA TENISON SMITH** approved payment to the Professional Group Public Consulting Inc  by approving Purchase Order #1802529

7                                        #6932179

Pursuant to A R S § 21-425, the State Grand Jurors find that the offenses described above were committed in Maricopa County, Arizona

(A "True Bill")


MARK BRNOVICH
ATTORNEY GENERAL
STATE OF ARIZONA

Dated _1-23-19_

MARY HARRISS
Assistant Attorney General

Foreperson of the State Grand Jury


8                                              #6932179

# Plaintiff Will Graven's Complaint

## Case No.:  CV2019-_____

## Filed June 28, 2019

## Assigned for all practical purposes to the Honorable

_____

*Will Graven,*

Plaintiff,

*v.*

*State of Arizona,*

Defendants,

in

United Sates District Court,
District of Arizona,
Phoenix Division.

# Exhibit 9

MICHAEL K. JEANES, CLERK
BY  E. Masis  DEP
FILED

15 AUG -3  PM 4: 27

MARK BRNOVICH
Attorney General
Firm Bar No. 14000

JOSEPH W. WATERS
State Bar No. 025819
Assistant Attorney General
1275 West Washington Street
Phoenix, Arizona 85007-2926
Telephone 602-542-3881
crmfraud@azag.gov

Attorneys for Plaintiff

## IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

## IN AND FOR THE COUNTY OF MARICOPA

STATE OF ARIZONA,

    Plaintiff,

v.

MICHAEL MARTIN (001),

and

               (002),

    Defendants.

Case No: CR 2015-002486

77 SGJ 6a

**INDICTMENT**

CHARGING VIOLATIONS OF:

**COUNT 1: CONSPIRACY**, Class 2
Felony, in violation of A.R.S. § 13-1003
(Defendant 001 & 002)

**COUNT 2: CONSPIRACY**, Class 2
Felony, in violation of A.R.S. § 13-1003
(Defendant 002)

**COUNTS 3-9: FRAUDULENT
SCHEMES & ARTIFICES**, Class 2
Felonies, in violation of A.R.S. § 13-2310
(Defendant 001 & 002)

**COUNT 10: FRAUDULENT SCHEMES
& ARTIFICES**, Class 2 Felony, in violation
of A.R.S. § 13-2310
(Defendant 001)

**COUNT 11 & 12: THEFT**, Class 2
Felonies, in violation of A.R.S. § 13-1802
(Defendant 001 & 002)

COUNT 13: THEFT, Class 3 Felony, in
violation of A.R.S. § 13-1802
(Defendant 001 & 002)



The Arizona State Grand Jury accuses, MICHAEL MARTIN and DANIEL

VICTOR ESPOSITO, charging on this 13th day of July, 2015, that in or from Maricopa

County, Arizona:

### COUNT 1

### CONSPIRACY

On or between October 1, 2005 and continuing thereafter up to and including

about the date of May 3, 2007, MICHAEL MARTIN and

defendants herein, with the intent to promote or aid the commission of an

offense, did agree with one or more persons, both known and unknown to the State Grand

Jury, that at least one of them or another person would engage in conduct constituting the

offenses, in particular:

1) FRAUDULENT SCHEMES AND ARTIFICES, in violation of A.R.S. § 13-
   2310

2) THEFT, in violation of A.R.S. §13-1802

In furtherance of this conspiracy and to effect the foregoing objects thereof, these

defendants and their co-conspirators did commit numerous overt acts, including but not

limited to the overt acts described in Counts 4 through 9 of this Indictment (which are

incorporated herein by reference as if set forth in full), in violation of A.R.S. §§ 13-1003,

13-2310, 13-1801, 13-1802, 13-701, 13-702 and 13-801.



### COUNT 2

### CONSPIRACY

On or between December 1, 2005 and continuing thereafter up to and including

about the date of May 1, 2006,                          defendant herein, with

the intent to promote or aid the commission of an offense, did agree with one or more

2

persons, both known and unknown to the State Grand Jury, that at least one of them or another person would engage in conduct constituting the offenses, in particular:

1) FRAUDULENT SCHEMES AND ARTIFICES, in violation of A.R.S. § 13-2310

In furtherance of this conspiracy and to effect the foregoing objects thereof, this defendant and their co-conspirators did commit numerous overt acts, including but not limited to the overt acts of engaging with outside corporate counsel to change corporate documents without lawful authorization, in violation of A.R.S. §§ 13-1003, 13-2310, 13-701, 13-702 and 13-801.

*Ref. 2*

## COUNT 3:

## FRAUDULENT SCHEMES & ARTIFICES

On or between June 1, 2006 and January 1, 2007, MICHAEL MARTIN and pursuant to a scheme or artifice to defraud, knowingly obtained a benefit from Arizona Building Systems by means of false or fraudulent pretenses, representation, promises, or material omissions, in an attempt to acquire the RCR Project, in violation of A.R.S. §§ 13-2310, 13-701, 13-702 and 13-801.

## COUNT 4:

## FRAUDULENT SCHEMES & ARTIFICES

On or between March 1, 2006 and January 1, 2007, MICHAEL MARTIN and pursuant to a scheme or artifice to defraud, knowingly obtained a benefit from Arizona Building Systems by means of false or fraudulent pretenses, representation, promises, or material omissions, in an attempt to acquire the Data Center Project, in violation of A.R.S. §§ 13-2310, 13-701, 13-702 and 13-801.

3

## COUNT 5:

### FRAUDULENT SCHEMES & ARTIFICES

On or between January 1, 2006 and January 1, 2007, MICHAEL MARTIN and pursuant to a scheme or artifice to defraud, knowingly obtained a benefit from Arizona Building Systems by means of false or fraudulent pretenses, representation, promises, or material omissions, in an attempt to acquire the Victorville Project, in violation of A.R.S. §§ 13-2310, 13-701, 13-702 and 13-801.

## COUNT 6:

### FRAUDULENT SCHEMES & ARTIFICES

On or between October 1, 2005 and November 26, 2007, MICHAEL MARTIN and pursuant to a scheme or artifice to defraud, knowingly obtained a benefit from Arizona Building Systems b y means of false or fraudulent pretenses, representation, promises, or material omissions, in acquiring the Circle G Pegasus Project, in violation of A.R.S. §§ 13-2310, 13-701, 13-702 and 13-801.

## COUNT 7:

### FRAUDULENT SCHEMES & ARTIFICES

On or between March 1, 2006 and April 10, 2007, MICHAEL MARTIN and pursuant to a scheme or artifice to defraud, knowingly obtained a benefit from Arizona Building Systems by means of false or fraudulent pretenses, representation, promises, or material omissions, in acquiring the Bioscience Project, in violation of A.R.S. §§ 13-2310, 13-701, 13-702 and 13-801.

## COUNT 8:

### FRAUDULENT SCHEMES & ARTIFICES

On or between November 16, 2006 and January 22, 2007, MICHAEL MARTIN and pursuant to a scheme or artifice to defraud,

4

knowingly obtained a benefit from Arizona Building Systems b y means of false or fraudulent pretenses, representation, promises, or material omissions, in acquiring the Kabookies Project, in violation of A.R.S. §§ 13-2310, 13-701, 13-702 and 13-801.

## COUNT 9:

## FRAUDULENT SCHEMES & ARTIFICES

On or between November 16, 2006 and May 3, 2007, MICHAEL MARTIN and pursuant to a scheme or artifice to defraud, knowingly obtained a benefit from Arizona Building Systems by means of false or fraudulent pretenses, representation, promises, or material omissions, in an attempt to acquire the Big League Dreams Project, in violation of A.R.S. §§ 13-2310, 13-701, 13-702 and 13-801.

## COUNT 10:

## FRAUDULENT SCHEMES & ARTIFICES

On or between March 20, 2006 and October 30, 2006, MICHAEL MARTIN, pursuant to a scheme or artifice to defraud, knowingly obtained a benefit from Arizona Building Systems by means of false or fraudulent pretenses, representation, promises, or material omissions, in an attempt to acquire the W.W. Williams Project, in violation of A.R.S. §§ 13-2310, 13-701, 13-702 and 13-801.

## COUNT 11:

## THEFT

On or between October 1, 2005 and November 26, 2007, MICHAEL MARTIN and without lawful authority, knowingly controlled property of Arizona Building Systems, of a value of $100,000 or more, with the intent to deprive Arizona Building Systems of such property relating to obtaining the Circle G

5

Pegasus Project, in violation of A.R.S. §§ 13-1801, 13-1802, 13-701, 13-702, and 13-801.

COUNT 12:

THEFT

On or between March 1, 2006 and April 10, 2007, MICHAEL MARTIN and
                        without lawful authority, knowingly controlled
property of Arizona Building Systems, of a value of $100,000 or more, with the intent to
deprive Arizona Building Systems of such property relating to obtaining the Bioscience
Project, in violation of A.R.S. §§ 13-1801, 13-1802, 13-701, 13-702, and 13-801.

COUNT 13:

THEFT

On or between November 16, 2006 and January 22, 2007, MICHAEL MARTIN
and                      without lawful authority, knowingly controlled
property of Arizona Building Systems, of a value of $4,000 and less than $25,000, with
the intent to deprive Arizona Building Systems of such property relating to obtaining the
Kabookies Project, in violation of A.R.S. §§ 13-1801, 13-1802, 13-701, 13-702, and 13-801.

TRUE BILL
(A "True Bill")

MARK BRNOVICH
ATTORNEY GENERAL
STATE OF ARIZONA

Dated: 8/3/15

JOSEPH W. WATERS
Assistant Attorney General
7145284B1v1

Foreperson of the State Grand Jury

6